## CHICAGO STEEL FOUNDRY CO. v. BURNSIDE STEEL FOUNDRY CO.

### No. 8017.

Circuit Court of Appeals, Seventh Circuit.

Jan. 20, 1943.

Rehearing Denied Feb. 10, 1943.

Geo. L. Wilkinson and Ralph Munden, both of Chicago, Ill., for appellant.

F. Allan Minne, of Chicago, Ill., for appellee.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Working in the molding and foundry art, Herman J. Georgen produced a product for which he obtained a patent, No. 1,926,-092, bearing date, September 12, 1933. The product, which is covered by said patent, he called "Apparatus For Forming Feed Screws and Conveyers."

It was promptly accepted by the trade, so he claims, and, because of lessened cost and desirable attributes, became popular with the industry.

Georgen's apparatus is used in casting screws of length and size such as are used in stokers, etc. It is in the making of screws which act as conveyers and are long and large, that manufacturers use this invention. In due course, the patent was transferred to the plaintiff who brought this suit.

Denying infringement, defendant also challenges the validity of the patent for want of patentable novelty.

Georgen has stated the problem which he had to meet and his solution in the specifications and drawings which he submitted to the Patent Office. We quote therefrom at length as these specifications state plaintiff's case rather fully and presumably as favorably as can be asserted in favor of the invention:

"My invention relates to an apparatus for casting feed screws and conveyers.

"Heretofore, where such articles were of any considerable size or length, it was found impracticable to cast such articles in a single piece because of the fact they could not be formed straight, nor smooth enough to overcome excessive machining and finishing costs. To some extent the problem of forming large, heavy duty feed screws and conveyers has been met by casting short length sections and then welding or bolting adjoining sections together to form a continuous length as desired. Objections to so forming these articles exists because of the great cost and because of the absence of a clean smooth finish occasioned by projecting bolt or other securing parts. Welding is costly and forms objectionable seams where the sections are joined.

"With this survey of the art in mind the primary object of this invention is to form, at a relatively low cost, one piece, cast feed screws or conveyers that will be devoid of projecting parts such as bolts, and which will be smooth and absolutely straight, whereby to eliminate straightening and finishing operations.

"Another object is to provide an improved apparatus for forming sectional molds to be used for casting such articles in continuous, one piece form.

"Other objects will become apparent to those skilled in this art as the disclosure is more fully made.

"Briefly, these desirable objects may be achieved in the present disclosed embodiment of the invention by providing a molding box with which will be associated an improved screw pattern of a predetermined sectional length with its flights split at the pattern ends along pitch lines although the split may be along any part of a pitch line. Next is provided a centering plate for properly holding and locating the pattern in position in the molding box. With this accomplished, molding sand is thereupon rammed into the box to form the sand mold. Thereafter a guide plate is substituted for the centering plate and by means later to be described the pattern is removed in a manner which will cause no injury to the mold. This operation will be repeated until the required number of sand molds have been so made for a predetermined length of feed screw to be formed. These molds are then arranged appropriately on a support, end to end, with the molds closely abutting to form a continuous mold with the molded impressions therein all communicating or registering. The molten metal is then poured into the mold at one end and allowed to work through completely to fill the entire length of sectional mold. When the metal has hardened the sand mold will be broken away leaving the finished article ready for removal of the sprue and adhering sand. * * Thus it will be seen that the entire pattern is formed as an integral member."

Two claims (2 and 3) are involved, and they read:

"2. The combination with a box for forming mold sections for a feed screw, of a screw pattern section arranged in the box and having flights fully to occupy the

box from end to end thereof and said pattern section at its ends being cut on pitch lines, and means for removing the pattern section endwise of'its length from a mold formed in the box whereby a number of such formed molds may be arranged end to end in registry for pouring a continuous feed screw with the adjacent sections thereof fusing along pitch lines to form a one piece integral feed screw.

"3. The combination with a box for forming mold sections for a feed screw, of a screw pattern having one or more flights arranged therein, said pattern at its ends being abruptly cut along pitch lines, and means for guiding and enabling removal of the pattern endwise of its length from a mold formed in the box, whereby a number of such formed molds may be arranged end to end in registry to pour a continuous feed screw with the adjacent sections thereof fused along pitch lines to form a one piece integral feed screw."

It is thus at once seen that we have a product patent covering a combination which is rather simple in construction and for which it is said, it worked satisfactorily, brought forth a less expensive screw and of the larger type, and in some respects a better screw than one commonly produced at the time.

We hardly feel justified in discussing at length the defense of infringement. We are persuaded that it cannot be sustained if we can find patentable novelty in the combination and give the patent a standing in the art to which its counsel argues it is entitled.

Counsel are in wide disagreement as to the construction of the claims in suit. This accounts for the wide divergence of their reasoning and conclusions. They start from different premises. Defendant stresses its fact assumption that neither claim of the patent defines a structure which was adapted to form molds for casting conveyers of variable pitch.[1] Its brief is bottomed on the statement that "with the apparatus defined in the claim it is not possible to make molds for the casting of any screw or conveyer except one having a uniform pitch through its length." It further says, "Before the court below no briefs were submitted and apparently this feature was completely overlooked by the trial judge."

Plaintiff, on the other hand, bases its argument upon the fact assumption that through the Georgen apparatus the manufacturer was enabled not only to produce extremely long screws of uniform pitch and diameter, but he was also enabled "to easily and cheaply produce screws *of any length,* of *variable pitch and diameter."*

To illustrate plaintiff's viewpoint it argues, "that a screw of great length of variable pitch and diameter is easily produced with the patented apparatus and if an order calls for a screw with five turns having a 2″ pitch and 3″ diameter, and nine turns of 2½″ pitch and 3″ diameter, and four turns of 2½″ pitch and 3½″ diameter, it is only necessary to make up sectional molds for each section of the screw, place the molds together with the screw flight portions of adjacent molds matching and pour a continuous screw." "When the sand is broken away from the casting the screw will be integral and its flights will be of varying pitch and diameter."

■ We must therefore first determine the construction of the claim. In reaching our conclusion we are aided but not concluded by the language of the specifications wherein Georgen said:

"It must be quite apparent that this invention can be utilized in forming right or left hand screws, and, screws having in a unitary full length, variable pitches and variable diameters."

Some meaning must be given to the term "pitch line" as used in the claims. Defendant's expert rejected the term entirely and said, "There is no such thing as a pitch line in this particular case."

On the other hand, plaintiff contends, and we accept its contention, that Georgen meant to define a pitch line to be a line at right angles with the axis of the screw passing through the screw flight.

■ In short, we adopt plaintiff's construction of these claims, because of the specifications and also because of the last two lines of each claim. We have always held that a patentee may be his own lexicographer and we add, his own grammarian. All he need do is to convey his thoughts, in his own language, but somehow make his invention clear, and do so in such a way that his counsel cannot give a different meaning to his words, before

---

[1] The term "pitch of a screw" is a trade name. It means the distance between the flight at the corresponding points.

the Patent Office than he does before the courts. He should not be allowed to stretch his words so that they are inclusive when infringement is being considered and restricted and narrowed when validity is challenged by disclosures of the prior art.

We find nothing in the record to embarrass plaintiff in its construction of its claims. The language used is not at variance with its consistently stated construction of these claims.

There was no need for Georgen to mention the size of the screws or the fact that the screws had variable pitches and variable diameter. The patent was not on the screws or conveyers. It was on the apparatus wherein the screws were made. The apparatus permitted conveyers of great length—with variable pitches, and it was neither necessary nor wise to describe the various products which could be made therein.

Validity of claims 2 and 3 of the patent.

The prior art is not barren. In fact, it is tolerably rich in disclosures. Defendant cites in the following order: More and his old patent, No. 133,592; Hainsworth, also ancient, No. 323,807; Wrigley, No. 511,393, issued somewhat later but fifty years ago; Springer, No. 819,094; Dimick, No. 1,544,056; and Carter, No. 1,779,763, issued in 1930.

It is not easy to ascertain defendant's chief reliance. In fact, we conclude that it relies on one patent for anticipation in one respect, and upon another patent disclosure for anticipation in another particular, and so on. This is not improper, but it hardly justified any asserted defense of anticipation.

We are unhesitating in our conclusion that no prior patent anticipated Georgen's apparatus, nor did all the prior art, taking one and tacking it on to another patent disclosure, anticipate the Georgen patent. It is not anticipation by anything disclosed in the prior art that perplexes us. But was there patentable novelty in plaintiff's apparatus over the prior art and the well known practices followed by molders and casters? This is the determinative question of the case.

What constitutes inventive genius seems to be undergoing a modification in meaning and in definition. New phrases are used to describe the test, or measuring stick. Picard v. United Aircraft Corp.,

2 Cir., 128 F.2d 632. Both the new tests and new words of description seem to be meeting with judicial approval. At least they are apparently helpful in striking down patents, a practice growing in popularity. These so-called changes in tests and in phrases describing them, have thus far failed to register strongly with us, as helpful in determining the question of invention.

Of course, the tests or standards which measure inventive talent should, as they have in the past, and will in the future, grow more exacting—call for greater expertness. For the skill of the mechanic probably in most fields in 1940 was higher than it was in 1900, which, in turn, was higher than it was in 1860. Better education, greater familiarity with machines, wider experience with equipment and participation in production of more complicated machinery, have raised the aptitude of him whom we call the mechanic. And it must be always kept in mind that patentable novelty or invention calls for something more than the skill of the mechanic.

In every art, for purposes of discussing the validity of patents, workers in the art are usually grouped into (a) the so-called mechanic and (b) the genius, a misappellation. Neither can be defined satisfactorily or in terms of easy, or uniform, application. Like the terms "ordinary and reasonable care" and the "ordinarily prudent man" as such terms are used in negligence or personal injury cases, the expressions "the mechanic skilled in the art," "genius," "flash of genius," and "happy thought" are glibly used, but they are difficult of helpful definition. Unhappily, in patent suits, the court must apply these terms and their definitions to the facts of the case. In personal injury cases, this task is passed on to a perplexed jury to wrestle with.

We have no doubt the average jury today expects a higher degree of care of the employer, against injury in a shop where large, complicated machinery exists, than it did thirty years ago. For a better reason, the mechanic skilled in the art wherein the patent appears, must be one whose qualifications and skill become higher and more exacting each decade.

But what, may we ask, is gained in certainty or clarity by adopting as a test or a definition of patentable invention or discovery, the "a flash of genius" test? Is it better understood to say that the skill

manifested by the worker in the art evidenced "a *flash* of genius" rather than a skill beyond that of the mechanic trained in the art? Does it more truly measure the character of the advance which patentable products or processes, evidence?

If we examine the finished machine, apparatus, or process which comes from the hand of the mechanic or researcher (or genius) who works in a certain art, is it understandable to say that there is patentable novelty if it results from a flash of genius, but not patentable invention if it is the result of long-continued experimentation? We think not.

We are advised and believe that in the field of science nearly all advance is made in laboratories where many experiments are made and discoveries result from the trial and error method.

We assume inventions of all kinds are desirable. Whether great or small, they are helpful. This is the verdict of history. This has always been the policy of this government. The nations, which have made the greatest advance in the last hundred years, are the three countries[2] which have rewarded the inventors through patents.

This assumption, of course, does not mean the patent laws of the United States are perfect or even satisfactory or can not, and should not, be substantially changed or modified. It does not even mean that the standard by which patentable novelty has been determined during the past one hundred years is correct or sound. Danger lurks in any system which injudiciously grants a monopoly to any citizen or group of people. Abuses by the monopoly holders are as old as monopolies themselves. If modifications, or repeal, of the statutes which provide for the issuance of patents and prescribe the protection which such grants convey, are to be made, they should be made by the Congress, not by the courts.

■ But the evil in our patent system which might well be attacked is not traceable to the practice of rewarding those who have alleviated suffering among our people, made life more livable, and brought comforts within the reach of an ever-increasing class of our people. The issuance of patents is not to reward the inventor, but to encourage discoveries which will benefit the people. The abuse of the patent practice, which accounts for the dissatisfaction and unrest and justifiable complaint which has increasingly manifested itself, is largely traceable to the effort of patent holders or their assigns to extend the patent monopoly through license agreements. Such practices include price fixation and the selections of exclusive licensees, who, because of their exclusive licenses, and their position in the industry, have been able to successfully engage in price fixing and in stifling competition to the great injury of the public.

The grant of exclusive licenses and the fixation of prices therein, the grant of patents on trivial and nonpatentable improvements, that are absolutely void, yet capable of use, in belaboring industry, and the grant of patents to aliens and their assigns, which are far more valuable than are patents granted to our citizens by foreign countries—these are the evils at which the corrective measures should be aimed. They in no way impeach the wisdom of rewarding those who contribute to the production of heretofore unknown products of great value, such as curative, medicinal, and health-giving discoveries, and cost-lessening inventions which bring luxuries within reach of the many.

Where the monopoly grant has not been unsoundly extended, or made hurtful, through license agreements, history records that patents are productive of greater competition in the long run than if inventions were not protected by patents.

To illustrate, an inventor brings forth an apparatus which is better and made at less cost than anything heretofore made or used in this field. All competitors are threatened with loss and perhaps ruin if an equally good product is not made and sold at prices which meet the new patented product. At once, the inventive and creative talents of competitors are aroused. They are spurred to their best efforts to produce, not merely as good, but a better, product, by a new, non-infringing method or apparatus. Thus, instead of displaying monopolistic traits, the patent fosters competition among inventors and begets new and better products at lesser costs. As a result the public is the beneficiary.

While this digression may not clarify the test by which invention should be measured, it may serve to reaffirm the recognized standards which throughout the

---

[2] United States, England, Germany.

past century have been applied by courts, with some degree of safety and satisfaction. They are under severe attack today, and this discussion is to emphasize the soundness of the standards which have been applied when considering the validity of patents.

There is surely some consolation in the thought that these old standards seem more real and are easier of application than for the court to ask itself, Was this product born out of a flash of genius?

The judicial task would be sufficiently difficult if we were to confine our study to the meaning of the term "genius" which, of itself, is a word to conjure with, elastic in meaning and appealing to the imagination. It may be said to be sufficiently elusive to avoid restriction or limitation of its meaning and yet suggestive of the activity of a super-brain, which only may bring forth inventions.

We could perhaps successfully wrestle (as we have with other tests) with the definition of the word "genius" and even apply its definition. But the restrictions which rise from the use of the phrase "*flash* of genius" make the test more baffling in its uncertainty and exclude the larger portion of those whose products have heretofore been understood as the work of an inventor.

We have assumed in our efforts to define the work of a genius, and differentiate it from that of the "mere" mechanic, that it manifests itself chiefly in capacities,—capacity for taking pains, capacity for observing phenomena, capacity for long and studied experimentation with eyes that see, capacity for long continuous mental concentration with an objective clearly in view, capacity for maintenance of, keeping alive, hopes, undimmed by failures; and capacity for originality and creativeness. The faith of the promise "Seek and ye shall find" is generally made true with the sweat of much trial and much error. But *seek* is emphasized as the key to success.

Such a definition of genius is at variance with that suggested by the expression "*flash* of genius." The test of "*flash* of genius" has been applied to curtain the field of patentable discovery and to eliminate from the protection of patents, all products (even though they came from the superior mind of genius) which were, nevertheless, the product of prolonged study and step by step advance. In short, it would eliminate nearly all the advances of history, in science, and in the field of mechanics. All that would be left are the products and processes which come to a genius, only occasionally, as flashes. Only a matured child prodigy (if there is any such being) is capable of experiencing such flashes.

Particularly in the field of medical science would a test of a flash of genius seem inappropriate. Take the vitamin field, insulin, aspirin, the field of anaesthetics, chloroform, ether, gases, etc., and the recent highly dangerous but valuable drug, sulfanilamide. Laboratory work of a decade is behind each discovery. No flash of genius, however brilliant it may be, can quite take the place of the inquiring mind and the many tests with rat and the guinea pig.

The same is true in the field of electricity. Take the radio. No flash of genius brought this marvel of our day into being. It is the product of a thousand improvements. Each step (save perhaps the adoption and use of the vacuum tube) was a short one. Standing alone and viewed from the rear, it is easy to argue there was nothing patentable in each such short step forward. But a hundred such steps and we have the difference between unbelievable success and failure,—a radio over which words and music could not be heard fifty miles, and often defeated by static, and one which brings the voice across a continent or an ocean. Eliminating static in a radio alone was a problem upon which hundreds worked. Its partial removal came only by experiments without number. Each improvement came slowly. Each advance was so tiny and unimpressive. Nevertheless, success rests on the successive small steps.

■ The test of a "flash of genius" should be rejected not only because it is incapable of acceptable definition but because it injects into the statute something not appearing therein. The Federal decisions covering a century contain many to the effect that *it is the fact of accomplishment,*—novelty appearing, rather than the method of accomplishment with which judicial inquiry is concerned.[3]

---

[3] Diamond Rubber Co. v. Consolidated Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; The Barbed Wire Patent (Washburn & Moen Mfg. Co. v.

The questions for the court are: What is the new product? What advance does it show over those in use or known to the art? Our interest is in the child, not in how or where it was born or who were its parents. Section 31, Title 35, U.S.C.A.

██ Nowhere in the statute can be found any words which require, or permit us to inquire into the quality of mind or the activity of the mind of the inventor to determine the patentability of his products or processes. Congress was interested in protecting the product of the mind,—not in whether it came as a flash to the mind or as a happy thought, or by long painstaking search and experimentation.

██ Approaching the specific question in this case—the patentable novelty of the apparatus described in the two claims of plaintiff's patent here involved, we are rejecting the flash of genius test. We are adhering to the view which we believe all scientific knowledge and advance in knowledge is built on—the step by step advance—the test and error method. Also we are following the view that invention lies in, and must be determined by, the product, not in the mental activities or contortions that brought it forth.

Also we are accepting the statement of plaintiff's counsel, when he says:

"No one in this art prior to Georgen ever provided apparatus for making sectional molds for casting screws in which the molding apparatus was so constructed that sectional molds constituting sections of the screw were formed and the ends of the resultant mold sections, due to the fact that the pattern section was cut by the mold box at right angles to the axis of the screw, could be matched up so that a continuous screw could be poured with the adjacent sections of the screw fused together."

Accepting this statement, the query persists,—Did such an apparatus evidence invention over the prior art?

██ The frailty of judicial judgment must be conceded. Yet the obligation is ours. Our judgment is that it was not. In reaching this conclusion, we must admit counsel has stated certain facts which can not be lightly swept aside. (a) The need for such an apparatus and the failure of anyone in the art to bring it forth. (b) The popularity of the apparatus once the trade learned of its existence. (c) Defendant's hiring the inventor and making its infringing copy. And back of its plea for patent recognition, plaintiff properly asks us not to take a rear view of his invention when applying our tests.

Notwithstanding the argument built on these facts, we are convinced that it was not invention to avoid the difficulty which was experienced by molding screws, which were heavy and long, at one casting. The conception of "sectional molds," to avoid expense and breakage due to the efforts to cast long and heavy screws, was obvious. Breaking the casting apparatus into sections, making as many as desired, was surely not beyond the ken or practice of the ordinary mechanic. Each segment could be so made that variation in pitch and diameter was possible. Means for uniting the several sections was neither new nor did it involve unusual skill. The apparatus which resulted from this conception was somewhat obvious and, we think, not the embodiment of patentable novelty.

The decree is reversed with directions to dismiss the suit.

---

Beat 'Em All. Barbed-Wire Co.) 1892, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Webster Loom v. Higgins, 1881, 105 U.S. 580, 26 L.Ed. 1177; Krementz v. Cottle Co., 1893, 148 U.S. 556, 13 S.Ct. 719, 37 L.Ed. 558; Eibel Process Co. v. Minnesota, etc., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Minerals Separation Co. v. Hyde, 1916, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286.