WARNER AND SWASEY COMPANY,
Plaintiff,

v.

Edwin HELD, Jr., as Executor of the Estate of Edwin Held, Sr., Deceased, and Edwin Held, Jr., d/b/a Enco Tool Works, a partnership, Defendants.

WARNER AND SWASEY COMPANY, Plaintiff,

v.

CUTTING TOOLS, INC., Thomas A. Mowry, Ethel Mowry (Mrs. Thomas A.) and Dan Samuel, Defendants.

Nos. 62-C-230, 62-C-231.

United States District Court
E. D. Wisconsin.

June 27, 1968.

See also, D.C., 256 F.Supp. 303.

---

Eugene R. Sawall, Milwaukee, Wis., for plaintiff; J. William Freeman and Reese Taylor, Akron, Ohio, of counsel.

Joseph P. House, Jr., Milwaukee, Wis., for defendants.

REYNOLDS, District Judge.

These two cases are suits for the infringement of the claims of two patents. The cases have been consolidated for trial.

Plaintiff alleges that the defendants in both cases have (1) directly infringed Patent No. 2,964,833 by making and selling insert bits of the type covered by the claims of such patent; (2) directly infringed Patent Nos. 2,846,756 and 2,964,833 by actively inducing others to infringe said patents; and (3) contributorily infringed Patent No. 2,846,756 by selling insert bits with knowledge that the bits would be used as replacement parts for the patented combination. The defendants answered denying infringement and counterclaimed for unfair competition. The counterclaim to the original complaint and the issue of the liability of the individual parties defendant were severed by pretrial order dated December 22, 1966.

Both the plaintiff and the defendants are in the tool business. The plaintiff manufactures a cutoff tool holder and a removable, consumable cutting insert bit. The cutoff holder is patented under No. 2,846,756 (hereafter referred to as the '756 patent). The removable, consumable insert bit is patented under No. 2,964,833 (hereafter referred to as the '833 patent).

Appended hereto and made a part of this opinion are sketches of the plaintiff's insert bit (Sketch I) and defendants' accused insert bit (Sketch II).

## PARTIES

The plaintiff, Warner and Swasey Company, has a division known as the Manchester Tools Division. The Manchester Tools Division came into existence as a result of the purchase of Manchester Machine & Tool Company by Warner and Swasey Company in 1963. Raymond E. Novkov and others incorpo-

rated the Manchester Machine & Tool Company in 1951. Mr. Novkov is the inventor of the devices in suit.

All of the defendants have been charged with the infringement of both the '756 and the '833 patents. Edwin Held, Sr., and Edwin Held, Jr., operated the Enco Tool Works as partners until the death of Edwin Held, Sr. The Enco Tool Works is a job shop founded in 1945. The plaintiff alleges that Enco Tool Works sold Sketch I insert bits before the issuance of the '833 patent, from about 1959 to December 1960, and after the issuance of the '833 patent made and sold Sketch II type bits designed to fit the Manchester holder.

Cutting Tools, Inc., is a commission sales agency that, at the time of the filing of this suit, had an arrangement with Enco Tool Works to sell and distribute the tools manufactured by Enco. Thomas Mowry is the president of Cutting Tools, Inc. Ethel Mowry and Dan Samuel are stockholders in Cutting Tools, Inc.

These cases concern two patents. The '833 patent on the removable, consumable insert bit was given the prime attention in the briefs of counsel. The defendants are charged with direct infringement of this '833 patent. The defendants are also charged with contributory infringement of the '756 patent on the tool holder. The prime defenses raised are invalidity and file wrapper estoppel.

## VALIDITY

The metal cutoff operation consists of feeding a cutoff tool into a rotating piece of metal, a part of which is being cut off. The downward rotational movement of the piece being cut off combined with the lateral feeding of the cutoff tool results in the cutoff operation. There appears to be at least two types of cutoff tools available. There are those cutoff tools with a "blade-like" geometry and the "bit-like" cutoff tools.

The '833 patent in suit here is of the "bit-like" configuration. The "blade-like" tool is very much larger in the top to bottom dimension than in the transverse direction, while the "bit-like" tool is pencil shaped. The plaintiffs suggest that the difference in configuration or geometry is one important difference between the prior art and the patents in suit.

The principal forces that operate in the art of metal cutoff are:

1. A downward rotational force against the tip of the tool caused by the rotational movement of the piece being cut off;

2. Reaction forces caused by feeding the tool into the revolving work piece; and

3. A lateral or twisting force that results from the just-described downward and feed forces.

The prior art dealt with these forces by the use of tools with a "blade-like" geometry. The height-to-width ratio found in the blade type tools gave these tools the requisite strength to withstand the forces described above. These blade type tools had disadvantages however. One of the most severe problems with the blade type tool arose when the blade needed to be sharpened. In sharpening or grinding the blade type tool, it was most difficult to keep the tool symmetrical. Each tool would be ground by the operator until he thought the tool had the proper clearance angles. Identical clearance angles on the opposed sides of the tool were most difficult to achieve by this method. If the opposed sides of the tool were not ground identically, the tool would tend to fishtail during the cutoff operation. Also, if during this grinding operation too much stock were removed, the tool would be weakened and have a tendency to break when subjected to the cutoff forces. The following clearance angles are necessary for

the proper operation of the cutoff tooling:

1. Front clearance—a tapering of the front edge of the tool from top to bottom;

2. Side clearance—a tapering of the opposed sides of the cutting portion of the tool from top to bottom; and

3. Back clearance—a tapering of the opposed side surfaces of the tool rearwardly from the frontal surfaces of the tool resulting in a compound angle.

The evidence introduced at trial demonstrated the need for the development of the devices patented by the plaintiff. In 1953, Raymond E. Novkov was presented with a cutoff problem relating to large diameter airplane landing gear rings which had a hardened weld spot. After trying all of the available cutoff art known at that time, he still had not succeeded in accomplishing the cutoff job efficiently. It was because of this problem that the devices now in suit came into existence. The "bit-like" tool, all carbide at the end invented by Mr. Novkov, resulted in a solution to his problem with respect to the landing gear rings. Some of the advantages of the bit-like geometry employed by Novkov in his tools are:

1. Longer life of the tool since less grinding is necessary as compared with the blade-like structures of the prior art;

2. Improved resistance to lateral and downward deflection of the tool during the cutting process resulting in a cleaner, more uniform cut as compared with the fishtailing found to be a problem with the blade-like prior art; and

3. Simplified and less time-consuming grinding operations since only the front edge of the bit need be ground.[1]

When the plaintiff's bit is in its holder, it is supported by a copper support blade. This support blade has a V-shaped groove which receives the com-

plementally shaped bottom portion of the bit. The bit is secured in place by tightening one bolt in the clamping block at the top of the holder. This facilitates easy removal and replacement of the bit. When the tool is ready for use, the bit is rigidly secured in its position between the clamping block and the copper support blade. The support blade is made of copper to facilitate rapid dissipation of heat during the cutoff process.

The holder and cutoff tool invented by Novkov gained immediate industry acceptance and was commercially successful.

The defendants have challenged the validity of the '833 and '756 patents in their pleadings and argument. The challenge was made on the statutory bases of obviousness, anticipation by prior art, abandonment, double patenting, and finally the failure to create a new and useful device. These defenses were not established at the trial of this case and, in fact, did not rebut the presumption of validity. 35 U.S.C.A. § 282; Artmoore Co. v. Dayless Mfg. Co., Inc., 208 F.2d 1 (7th Cir. 1953).

It appears that the real thrust of defendants' argument for invalidity is that the '833 patent is invalid if it is now given the construction the plaintiff asks for. Although the prior art patents disclose some features found in the '833 patent, the defendants have not cited prior art that teaches a cutoff tool which is all carbide at the cutting end. Defendants have not argued that the '833 feature, known as the "full butt brazed tip all carbide at the end," was obvious from the prior art, and this court is convinced that it was not. It is clear to this court that the differences between the devices in suit and prior art patents are not such that the patented devices would have been obvious at the time the inventions were made to a person having ordinary skill in the art.

---

1. Further advantages of the plaintiff's tool, which become apparent when the bit is ground or sharpened, will be dealt with in a later part of this opinion dealing

with a comparison of the accused wafer insert with the '833 insert which is all carbide at its cutting end.

After a full review of the prior art patents [2] and consideration of the arguments of counsel, this court finds that both the '756 and the '833 patents are valid. This court further concludes that the '756 and the '833 patents have a common filing date of May 2, 1955.

## INFRINGEMENT

About 1959, Arthur Mattes, a purchasing agent for Allis-Chalmers Manufacturing Company, contacted Edwin Held and arranged for the duplication of the Sketch I tool. The plaintiff notified the defendants that it was felt that supplying Sketch I inserts to owners of the '756 combination device constituted infringement of the '756 patent. In December of 1960, the '833 patent issued. The plaintiff then gave Allis-Chalmers notification that the '833 patent had issued, and Allis-Chalmers agreed that there would be no further purchase of tools covered by the '833 patent from

2. Patents listed on page 120 of '833 file wrapper, cited to the Patent Office and considered by this court:

### UNITED STATES PATENTS

| Name | Number | Date |
| --- | --- | --- |
| Brooks | 1,885,679 | Nov. 1, 1932 |
| Emmons | 1,887,372 | Nov. 8, 1932 |
| Schultz | 1,922,178 | Aug. 15, 1933 |
| Anthony | 2,416,975 | Mar. 4, 1947 |
| Middleton | 2,595,090 | Apr. 29, 1952 |
| Bader | 2,683,302 | July 13, 1954 |
| Greenleaf | 2,697,866 | Dec. 28, 1954 |
| Novkov | 2,737,705 | March 13, 1956 |

### FOREIGN PATENTS

| Country | Number | Date |
| --- | --- | --- |
| Germany | 750,726 | Jan. 24, 1945 |
| Germany | 887,592 | Aug. 24, 1953 |

Patents listed on page 49 of '756 file wrapper and considered by the court:

### UNITED STATES PATENTS

| Name | Number | Date |
| --- | --- | --- |
| Carr | 1,045,512 | Nov. 26, 1912 |
| Fry | 1,104,980 | July 28, 1914 |
| Studinka | 1,509,792 | Sept. 23, 1924 |
| Firth | 1,843,549 | Feb. 2, 1932 |
| Emmons | 1,887,372 | Nov. 8, 1932 |
| Anthony | 2,149,038 | Feb. 28, 1939 |
| Moore | 2,181,023 | Nov. 21, 1939 |
| Zasada | 2,243,239 | May 27, 1941 |
| Anthony | 2,254,056 | Aug. 26, 1941 |
| Clark | 2,341,314 | Feb. 8, 1944 |
| Littmann | 2,365,965 | Dec. 26, 1944 |
| Anthony | 2,398,913 | Apr. 23, 1946 |
| Anthony | 2,416,975 | Mar. 4, 1947 |
| Anthony | 2,453,959 | Nov. 16, 1948 |

The following prior art patents were also cited to and studied by this court:

| | | |
| --- | --- | --- |
| Girardin | 2,623,271 | 1950 |
| Metzler | 2,679,679 | 1951 |
| Krause | 2,713,714 | 1952 |
| Bader | 2,716,799 | 1951 |
| British Patent | 568,876 | 1945 |

persons other than the plaintiff. It was about this time when the defendants and Allis-Chalmers changed from Sketch I tools to Sketch II. On November 1, 1960, Allis-Chalmers through its employee Mr. Mattes, prepared drawings of the Sketch II device.

The defendants Edwin Held, Jr., and Enco Tool Works produced the Sketch II insert bit for Allis-Chalmers sometime before November 1961.

Mr. Thomas A. Mowry is the owner and operator of Cutting Tools, Inc., and also makes sales calls for the company. At the trial of this case, Mr. Mowry testified that Allis-Chalmers had requested him to look into the possibility that Allis-Chalmers should switch from Sketch I to Sketch II insert bits with the idea that costs could be saved. Sketch II tool bits are about twenty percent less expensive than the Sketch I type. About November 1961, Allis-Chalmers began to purchase the Sketch II type bit from Mr. Mowry.

The activity of the defendants prior to the issuance of the '833 patent raises the question of whether there was infringement of the '756 patent during the period just preceding the issuance of the '833 patent. It is clear that the insert bit was the consumable component of the '756 combination. The opinion of the court in Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 342, 81 S.Ct. 599, 602, 5 L.Ed.2d 592, is dispositive of this issue. In that case the Supreme Court said:

"This Court's decisions specifically dealing with whether the replacement of an unpatented part, in a patented combination, that has worn out, been broken or otherwise spent, is permissible 'repair' or infringing 'reconstruction,' have steadfastly refused to extend the patent monopoly beyond the terms of the grant. Wilson v. Simpson, 9 How. 109 [13 L.Ed. 66] doubtless the leading case in this Court that deals with the distinction

—concerned a patented planing machine which included, as elements, certain cutting knives which normally wore out in a few months' use. The purchaser was held to have the right to replace those knives without the patentee's consent. The Court held that, although there is no right to 'rebuild' a patented combination, the entity 'exists' notwithstanding the fact that destruction or impairment of one of its elements renders it inoperable; and that, accordingly, replacement of that worn-out essential part is permissible restoration of the machine to the original use for which it was bought. 9 How., at page 123. * * *"

■ This court is convinced that there was no direct or contributory infringement of the '756 patent in the replacement of the insert bits by the defendants prior to the time the '833 patent issued.

This leads the court to a consideration of the most important issues of this lawsuit, namely:

1. Whether the Sketch II device directly infringes the '833 patent, and

2. Whether there is file wrapper estoppel in this case preventing an application of the doctrine of equivalents.

The first consideration must be given to the question of whether or not the claims of the '833 patent, read in light of the specifications, describe the Sketch II device. The defendants' position is that the three basic elements of the '833 claim cannot be found to read on the Sketch II device. The '833 patent has two claims. The first claim contains the three elements challenged by the defendants. The first claim reads as follows with the italicized portions being the elements in question:

"An elongate insert bit for use with metal cutting tools, comprising: an elongate shank having opposed top and bottom surfaces, opposed side surfaces and first and second end surfaces; a cutting tip having opposed

top and bottom surfaces, opposed side surfaces and first and second end surfaces, *with said first end surface of said tip being fused to said first end surface of said shank whereby said tip projects longitudinally of said shank* with said second end surfaces of said shank and said tip defining longitudinal extremities of said bit; and a cutting edge extending transversely of said top surface of said tip at its point of juncture with said second end surfaces of said tip; *said top and bottom surfaces of said tip and shank being respectively disposed in substantially coplanar relationship with each other*; said bit having a longitudinal center; the transversely opposed points of said opposed side surfaces of said tip and said shank being spaced at equal transverse distances from said longitudinal center throughout the longitudinal extent of said bit; the elongate length of said bit being a substantial multiple of the distance between said top surfaces and said bottom surfaces; *said bottom surfaces of said shank and said tip being V-shaped with the apex of said V-shaped bottom surfaces being disposed substantially centrally between the opposed side portions thereof."*

■ Reading the patent claim strictly without use of the doctrine of equivalents, this court feels constrained to agree with the defendants' conclusion that Claim 1 does not read on the Sketch II device. The defendants have made reference to three separate distinctions between the Sketch II device and Claim 1 of the '833 patent. The first distinction has been known throughout the trial as Element C. Element C can be paraphrased as requiring the tool to have the first end surface of the tip fused to the first end surface of the shank whereby the tip projects longitudinally of said shank. In the Sketch II insert, we find the first end surface of the wafer tip fused to the shank with weld joints at the bottom of the wafer and at the first end surface of the waf-

er. The defendants argue that the wafer is not welded to the first end surface of the shank since the wafer rests upon and is supported by the shank. The plaintiff argues that the steel support for the wafer is not part of the shank but in reality is part of the tip. The plaintiff must reason then that once the wafer is in place, the rearward part of the cut out portion of the shank becomes the first *end* surface of the shank. This reasoning ignores the fact that the bottom of the shank which supports the wafer is a part of a solid piece of steel which extends the length of the tool. Confining the claim language and specifically the word "end surface to its ordinary meaning; that is, the terminal point or part of any material object that has length, this court is unable to adopt plaintiff's reasoning. The word "end" surface must be given its ordinary meaning since the patent specifications and persuasive evidence presented suggest no other. It is for these reasons that this court is constrained to adopt the defendants' argument that the first end surface of the tip in Sketch II is not fused to the first end surface of the shank.

The next point of distinction has been referred to during the trial as Element F. Element F restricts the device to having top and bottom surfaces of the cutting tip and the shank substantially coplanar with each other. Here again the argument revolves around the definition of the tip of the tool.

The defendants argue that the bottom surface of the cutting tip is the bottom of the carbide wafer and not the bottom of the tool. This argument makes it apparent that then the bottom surface of the cutting tip is not coplanar with the bottom surface of the shank. In fact, the cutting tip of the wafer rests on the shank extension. This court is convinced that to find this element present in the Sketch II tool, the claim language would need a little imaginative embellishment. This court finds that Element

F in the '833 claim language does not read on Sketch II.

Element J is the defendants' third suggested reason why Sketch II is not described by the claim language. Element J describes the insert bit as having V-shaped bottom surfaces on both the tip and the shank. Accepting the definition of the word "tip" as being the part synonymous with the wafer or working surface of the tool, this court must agree that the Sketch II device does not have a tip with a V-shaped bottom. The steel portion of the shank upon which the wafer rests is V-shaped but the wafer is not. This, then, is the third element missing from the Sketch II device.

The Tool Engineers Handbook (Mc-Graw-Hill Book Co., Inc., 1949) agrees with the defendants' definition of the word "tip." The Handbook states at page 1375: "A *tip* is a piece of cutting-tool material of any shape for attachment by welding, brazing, or the like to a supporting shank to form the cutting edge and working surfaces of a cutting tool."

The Handbook further defines "Tipped Tools" at page 1374 as "those having a relatively small piece of metal-cutting material attached to a shank of noncutting material. The tip is ground to form the tool face and the cutting edge. It may cover the whole upper face of the shank and point, or it may consist of only a portion or all of the upper face of the point. Such tools are sometimes known as 'composite' tools. The tips may be attached to the shank or holder in any of several ways, such as soldering, brazing, welding, or clamping."

A salient point is that the word "tip," as used in the claims of the patent, is narrowed by the modifying word "cutting." A cutting tip, it would seem to this court, is less than the whole end of the tool. It is clear that the forward extension of the steel shank which supports the wafer in the Sketch II device does no cutting at all. The claim language then would be stretched if this court found that the cutting tip included the supporting steel extension.

■■ The fact that Sketch II performs the same function as Sketch I does not lead to a conclusion that there has been infringement. As was said by the Court of Appeals for the Seventh Circuit in Peters & Russell, Inc. v. Dorfman, 7 Cir., 188 F.2d 711, 714 (1951):

"'* * * defendants' accused structure not only served the same purpose but that it is essentially identical with plaintiff's commercial device. But it is our understanding of the law that it is the claim which measures the extent of the grant and that express limitations in a claim cannot be ignored in the determination of infringement. Universal Oil Products Co. v. Globe Oil & Refining Co., [7 Cir.] 137 F.2d 3, affirmed 322 U.S. 471, 484, 64 S.Ct. 1110, 88 L.Ed. 1399. Especially is this true where the claim was allowed, as here, under circumstances which require that it be strictly construed and limited to the particular elements disclosed."

The above finding by the court that the '833 claims do not describe the Sketch II device *without operation of the doctrine of equivalents* would seem to have been conceded by the plaintiff's expert. The expert testified as follows (trial transcript, page 170):

"Q Do you find, therefore, that each and every element of Claim 1 of U. S. Patent 2,964,833 is present in the Sketch II construction?

"A Yes, I do, in identical form *or an equivalent.*" (Emphasis added.)

Since this court has found that there are three elements of Claim 1 of the '833 patent which do not read on the defendants' Sketch II device, it would be necessary for these three elements to be found in the Sketch II device by the doctrine of equivalents. The doctrine of equivalents is dependent upon a finding by this court of an absence of file wrapper estoppel.

## FILE WRAPPER ESTOPPEL

The plaintiff suggests that file wrapper estoppel can exist only when the patentee has given up a claim to the Patent Office, and that the claim which was given up was specifically directed to a device which is later charged to be an infringement. Plaintiff argues that file wrapper estoppel cannot exist in this case because the claims which were presented to and cancelled by the Patent Office never read on the Sketch II device, assuming the defendants' interpretation of the language of the claims in suit.

The defendants argue for a broader interpretation of the doctrine of file wrapper estoppel. The defendants say that file wrapper estoppel arises not only on the basis of amendments and cancellation of claims but also on the basis of representations to the Patent Office. The defendants cite the following authority in support of their position: Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966):

> "It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. Hogg v. Emerson, 11 How. 587 [13 L. Ed. 824] (1850); Crawford v. Heysinger, 123 U.S. 589 [8 S.Ct. 399, 31 L. Ed. 269] (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. Powers-Kennedy [Contracting Corp.] v. Concrete [Mixing & Conveying] Co., 282 U.S. 175, 185–186, [51 S.Ct. 95, 75 L.Ed. 278] (1930); Schriber [Schroth] Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221 [61 S.Ct. 235, 85 L.Ed. 132] (1940)."

It is clear to this court that the plaintiff was granted its '833 patent over a very crowded prior art. The application claims underwent substantial revision before the Patent Office granted the '833 patent. The Patent Office rejected the first seven claims presented to it on the basis of prior art which disclosed an elongated cutting bit backed by a follower or filler member. The examiner also noted that the specific contours of the insert bit were dictated by the design of the holder and were therefore not patentably significant. After further revisions, the applicant argued that his tool shows invention in that it is all carbide at the end. This was said to be significant in light of the grinding operations which must be employed to sharpen the tool. Insert bits of the Sketch I type are sharpened with a diamond grinding wheel. The applicant represented to the Patent Office in reference to the Anthony tool (2,416,975) that:

> "* * * Such a diamond tool, however, will of necessity engage the end of the support blade 40, and with this being of soft steel, damage to the diamond wheel results invariably because of the fact that the soft steel has a detrimental effect and prematurely destroys the diamond cutting tool.
>
> "By way of contrast, therefore, Applicant presents a tool that is all carbide at the end to be sharpened and there is no such problem involved when Applicant's tool is removed for sharpening." (File wrapper, page 37.)

After the rejection of the claim as then presented, the applicant appealed to the Board of Appeals from the final rejection by the examiner. In his brief filed with the Board of Appeals, the applicant argued (page 66 of the file wrapper):

> "Anthony Patent 2,416,975
>
> "To this end the Court will note that the following limitations of the appealed claims are submitted to be absent from the teachings of the primary reference to Anthony.

"1. Anthony does not show an insert unit that shows the opposed top and bottom surfaces of the shank and tip being coplanar.

"2. Anthony does not show a cutting tip that projects longitudinally from the end of the shank so as to constitute an extension of the shank.

"3. Anthony does not show a shank whose end surface is brazed to a cutting tip that projects longitudinally therefrom.

"4. Anthony does not show an insert bit where the distance between the top and bottom coplanar surfaces of shank and tip is slightly greater than the distance between the opposed side surfaces thereof (Claim 14 only).

"5. Anthony does not show an insert bit having the coplanar bottom surfaces of shank and tip V-shaped, with the apex of the V-shaped bottom surface being disposed centrally between the opposed side portions thereof (Claim 17 only)."

The examiner's answering memorandum recognized the suggested differences between the Anthony device and the patent in suit. That memorandum noted (pages 84–85 of the file wrapper):

"* * * The difference between the reference bit (15) and the appellant's bit (51) is that the reference bit (15) has a cut-out (46) holding the tip (45) whereas the appellant's tip (51) forms the entire end portion of the bit (50), * * *."

The Anthony tool (2,416,975) was a prime reference to the prior art that was cited by the examiner. That Anthony tool has a wafer insert but is blade-like in the sense that it has a greater height-to-width ratio (approximately 13 to 1) than do the tools in suit which are pencil-like (with a 5 to 1 or less ratio). In distinguishing this Anthony tool from the Sketch I type, the applicant told the Patent Office (pages 36–37 of the file wrapper):

"The principal ground of rejection applied against the claims previously presented was Anthony 2,416,975, in combination with either Emmons in one case or Brooks or Schultz in the other case.

"A careful examination of the Anthony reference reveals that the same is deficient against claims 13 through 18 for several reasons.

"First, there is no fusion of a cutting tip in Anthony to a 'second end surface' of the shank. Second, there is no tip in Anthony that 'projects longitudinally of said shank'.

"Further, and as a third point of distinction, the bottom surface of the cutting tip 45 and the support plate 40 are obviously not coplanar.

"The sole teaching of the secondary references in this regard is that the same teach that brazing can be employed to secure a bond between steel and carbide, for example.

"This is, however, admitted by the Applicant to be old, and Applicant directs the Examiner's attention to the fact that it is Applicant's intention to have the longitudinal ends of the insert bit defined by different materials."

This court is convinced that because of the crowded prior art which taught variations of many of the elements found in the Sketch I tool, the plaintiff was required to narrow his claims to and argue for a patent on a bit-like tool possessing a full butt brazed tip. The full butt brazed tip, all carbide at the end, represents the essence of the invention, at least in the sense that this is the feature that allows the tool to be ground with a diamond wheel without harming the wheel.

It appears that the Sketch II device with a front portion of part carbide and part steel would raise the same sort of problem found in the Anthony tool if grinding were done with a diamond wheel. However, the Anthony tool with its blade-like geometry has much more

steel under the cutting tip than does the Sketch II device, so the problem raised in grinding the Sketch II device would be somewhat less that that found with the Anthony tool. Mr. Novkov testified (page 484) that there would be very little impairment of the diamond wheel in grinding the Sketch II device. Mr. Held, however, disagreed and testified that the use of the technique of grinding the steel part with a cheap wheel and the carbide part with a diamond wheel would result in a substantial saving on the cost of the grinding operation. The file wrapper disclosed that the following argument was made in the Patent Office in support of a bit tool, all carbide at the end (page 37 of the file wrapper):

"The advantage of this arrangement was carefully brought out at the above interview, wherein the inventor explained that in the use of a tool of the type of Anthony, it is necessary to employ a diamond wheel for the purpose of grinding the insert 45. Such a diamond tool, however, will of necessity engage the end of the support blade 40, and with this being of soft steel, damage to the diamond wheel results *invariably* because of the fact that the soft steel has a detrimental effect and prematurely destroys the diamond cutting tool." (Emphasis added.)

These representations to the Patent Office are to a significant extent inconsistent with Mr. Novkov's testimony at the trial. This court is of the opinion that Mr. Held's testimony on the question of the effect on diamond grinding wheels of the soft steel support portion of Sketch II is more credible and entitled to more weight.

■ This court is further persuaded that the patentee effectively convinced the Patent Office that the claims of the '833 patent would not include the tools with a recessed carbide tip construction as shown in Anthony Patent No. 2,416,975. In light of this, plaintiff cannot now be allowed to take the position that the claims read on a wafer bit of the Sketch II type. Whether this conclusion is called file wrapper estoppel or narrow construction of patent claims required because of representations made to the Patent Office makes no difference. As was said in the case of Consolidated Water Power & Paper Co. v. Kimberly-Clark Corp., 107 F.Supp. 777, 788 (E.D.Wis.1952), 204 F.2d 573 (7th Cir. 1953):

"When an applicant for a patent limits his claims in the course of prosecution of the patent and explains such limitation, he is bound by such limitation and explanation and may not later expand his claims except in accordance with the file wrapper."

The language used by the Court of Appeals for the Seventh Circuit in the case of Falkenberg v. Golding, 195 F.2d 482, 485 (7th Cir. 1952) is also instructive:

"* * * An applicant may not, before the Patent Office, limit the use of the words in his claims narrowly to avoid the prior art and thus obtain allowance and then subsequently urge a broader construction and attribute to his words a meaning which he previously disclaimed in an effort to establish the claim. Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812 at page 815; Penmac Corporation v. Esterbrook Steel Pen Mfg. Co., 2 Cir., 108 F.2d 695 at page 697."

■ For the foregoing reasons, this court finds that the '833 patent is not entitled to any range of equivalents, and, consequently, the Sketch II device does not infringe the '833 patent.

The foregoing opinion constitutes this court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for the defendants are requested to prepare an order in accordance with the foregoing opinion, submitting it to opposing counsel for approval as to form only.

APPENDIX

## TOOL BIT OF PLAINTIFF'S PATENT AND PLAINTIFF'S SKETCH I

## DEFENDANTS' ACCUSED TOOL BIT AND PLAINTIFF'S SKETCH II

SKETCH I and SKETCH II