## NATIONAL SLUG REJECTORS, Inc. v. A. B. T. MFG. CORPORATION.

### No. 9194.

Circuit Court of Appeals, Seventh Circuit.

Oct. 17, 1947.

Rehearing Denied Dec. 8, 1947.

Writ of Certiorari Denied Feb. 9, 1948.

See 68 S.Ct. 459.

[1] 28 U.S.C. following Section 723c.

Clarence J. Loftus and Charles M. Hogan, both of Chicago, Ill., for appellant.

Clarence E. Threedy, of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and MINTON, Circuit Judges.

EVANS, Circuit Judge.

This appeal involves a patent on a "coin selector" issued to Benjamin Fry and num-

bered 2,292,628, and assigned by Fry to plaintiff.

The District Court materially narrowed the issues when it found that the defendant's structure infringed claim 21 of the patent. It also found that the invention of plaintiff's assignor was prior to an invention made by one Patzer, an employee of defendant, whose product was relied upon by defendant to defeat the patent in suit.

The defendant accepts and now offers no challenge to the District Court's rulings on infringement and priority. Nor does it press its counterclaim.

The District Court found in defendant's favor on the issue of validity, holding that there was no patentable novelty in the combination described in claim 21 of the patent. The Court also concluded

"Claim 21 of the Fry patent 2,292,628, is void as defining an aggregation of elements all old in the art which in their aggregation perform or produce no new or different function or operation from that theretofore performed or produced by them in their separate state."

We can set this latter conclusion to one side because of its dependence on the soundness of the holding on invalidity.

We believe we can correctly say the heart of this controversy turns upon the finding or conclusion of the trial court wherein it pronounced the following:

"A mechanic skilled in the art, upon being called upon to produce the desired results intended to be accomplished by the device of claim 21 of patent 2,292,628 in suit, to-wit, that of separating undersized coins from coins having predetermined acceptable diameters, having before him the DuGrenier patent 2,033,930, the Cahoon patent 454,425, and the Trippensee patent 953,363, would without the exercise of anything more than mechanical skill, substitute the coin testing means of either Cahoon or Trippensee for that of the counterbalanced lever 26 of DuGrenier, and in making this substitution there would be no invention involved."

The District Court here placed its finger on the determinative question in the case.

Assuming as we do that the defendant's structure infringed claim 21 of the patent in suit and assuming further that plaintiff's invention was prior to that produced by defendant's employee, we are at once brought face to face with that age-old dispute between the two kinds of skill displayed by one who produces a new product. In other words, our query is,—Was Fry, when he brought forth his coin selector, an inventor, or was he a mechanic?

Before going into the details of this particular structure, it should be noted that there is no question but that there were both (a) utility and (b) novelty, in plaintiff's coin selector.

■ As to utility, it may be said the invention was of small coverage and of even smaller importance. If the coin selector made possible the rejection of underweighted coins, or served better to eject such coins, it possessed utility. It is not the extent of the utility that governs, but the existence of *some* utility.[1]

■ Likewise, as to novelty, the improvement or change may evidence no outstanding or revolutionary difference in mechanism. No giant's stride is demanded. Novelty involves the presence of some element or the new position of an old element in a combination, different from anything found in any prior structure.

■ The statute defines in clear language, inventions which are patentable.

"Any person who has invented or discovered *any new and useful art,* machine, manufacture, or composition of matter, or any new and useful improvements thereof * * * not known or used by others in this country, before his invention or discovery thereof * * * may * * * obtain a patent therefor." 35 U.S.C.A. § 31.

There must be novelty; there must be utility. The statute exacts nothing more. The courts, however, have long recognized that there must be something present which modifies the kind or quality of the novelty. They have long, if not always, required that there be something in the originality, —something about the novelty, which makes the "new" in the mechanism something to

[1] 40 Amer. Jurisprudence, "Patents", Sec. 43, p. 546.

cause the court to say "here an inventor labored."[2]

■ This century-old question is always perplexing. We can not avoid or evade it. We must meet it. Patentable invention is a question of law. Loney Co. v. Ravenscroft, 7 Cir., 162 F.2d 703. We are of course, permitted, and, in fact, required to give weight to the opinion of the learned District Court, just as it, as well as we, should give weight to the opinion of the Patent Office.

■ But neither court can accept as final the conclusion of the Patent Office. It is entitled to a presumption in its favor, nothing more.

■ We are likewise compelled to give weight in case of doubt to the evidence which may be drawn from the voice of the user,—that is give weight to public opinion, which is shown by the way the public accepts the product and recognizes the producer. In this case there was evidence of extensive use. Such use of nickel slot machines was in fact far greater than we had supposed. And by no means are they used only in gambling devices. Nor are those who seek to cheat the machine apparently limited in number.

Between V-J day and the beginning of the trial, orders amounting to $1,517,550 had been placed with plaintiff. All the machines embodied claim 21 of the patent in suit. We are inclined to give less weight to this extensive use, however, for the war had interrupted the manufacture of such machines, and the demand was heavy in all lines of manufactured goods.

We can not, however, dispose of the case on mere presumptions. We must study the prior art and ascertain to what extent the field was closed to Fry by virtue of the patents to Cahoon, Trippensee, and Du-Grenier.

It would be no misstatement to say that the answer to the query—was the new combination the work of a skilled workman or the product of an inventor—depends largely on the standards which the trier applies. Just as in other tort causes of action, we find there are close cases and others quite free from differences of opinion, so in patent disputes there are those who accept complicated machinery as strong evidence of inventive skill. While others, seemingly assume that if they can understand the mechanism after it has been explained to them, there is no invention. They approach the test as something presented by the completed machine, instead of a problem which was presented to the worker before any machine was brought forth. Nothing seems harder for the judges (often like the writer not in the least interested in complicated mechanical combinations) to keep clearly in their minds that the inventor was working on a problem and with an idea only— trying to put into actuality a hope or a nebulous something that had to have its parts created and adjusted—*and then made to work*. With the completed machine before us, we find it hard, in fact almost impossible, to put ourselves in the place of the inventor who was endeavoring to put elements together and make them work so as to produce a desired end.

As the years and decades have passed by, it is quite clear that the test of patentable novelty has grown more and more severe and exacting. Greater ability is attributed to the skilled mechanic. As a result, new mechanical combinations which fifty or thirty or even fifteen years ago would have readily and unhesitatingly been recognized as invention and something more than the skill of the mechanic are now in the field of doubt and uncertainty if not actually rejected as patentable inventions.

But greater skill on the part of the mechanic is not the only explanation of this rather sharp rise in the standards and tests which are used in this field. The tests, the measuring standards, are not a fixed and universally applied measure. At best, the standard is relative in nature and is created by each judge as he seeks to measure the advance of the alleged inventor. Uncertainty is almost sure to accompany relativity in testing methods. One court will reject what another accepts as patentable novelty, solely because of the difference in measuring standards.

---

[2] Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812.

True, the test may well be described in the same old phrases, to-wit, mechanical skill and inventive genius—but words must, and do, give way to the actual standard which the mind of the judge fashions for measuring the knowledge and other gifts of that hypothetical person called the "skilled mechanic." Like in another field of tort, the "ordinary man" sometimes varies in his stature and in his knowledge and experience.

■ Blocking the way to Fry's claim as an inventor are three patents which are part of the prior art and deal with combinations of the same general character as the patent in suit.

There are other structures in the prior art, but the District Court relied on three patents which counsel relied on in the oral argument in this Court.

The first was issued to Cahoon in 1891. The patentee called his invention a "vending apparatus" and he states his objectives in his specifications as follows:

"This invention relates to certain new and useful improvements in coin-controlled devices, and while it is designed, primarily, for the sale of postage-stamps, I of course do not intend to restrict myself to such use, as it is evident that it may be used for a variety of articles of merchandise and I propose to make the pocket-wheel removable and interchangeable, so that wheels may be used in accordance with the nature of the articles to be dispensed by the machine."

The second patent relied on was a patent to Trippensee. This patent bore date 1910 and was described by the inventor as a "coin tester."

Plaintiff rejects it as non-workable, as never having been used in the thirty-seven years which have elapsed since its issuance.

The third patent is the one to Du-Grenier, and it was issued in March, 1936. The objective of this inventor is stated in his specifications as follows:

"This invention relates to mechanism employed in coin controlled vending machines, which are designed to intercept and return defective coins or slugs and more particularly coins which have been bent, so that they do not have flat sides, but which are otherwise substantially perfect, so that the ordinary tests as to weight, diameter and magnetism do not effect the rejection and return of the coin."

It is clear that a prior combination may anticipate even though the inventor had no such objective in mind when he made his invention.

It may anticipate even though its use in another field was entirely unknown. In other words, it is the combination which is described and disclosed which we must look to rather than to the avowed object of the inventor set forth in his application for a patent. And so, in this case, we must look further than the objectives of the three inventors before we reject them as anticipating prior art.

Defendant asks us to take the drawings and specifications of Cahoon and then add to them the teachings of the patent to Trippensee which never found expression in a single product and then study DuGrenier and, by uniting all of them, produce a combination over which the making of the Fry machine was allegedly mere mechanical skill.

In the first place, it is rather hard on a patent running the test of patentable novelty, to take the most favorable construction of the drawings in another patent, and for which the inventor never intended them to be used, with drawings of another patent never put in use, and tie them up with the drawings of still another patent, not used as a lower weighted spurious coin ejector and out of all three designs create a mechanism which could be used to eliminate an under-weighted coin.

Undoubtedly we must examine these specifications and drawings individually and collectively but we should not give to them an application or construction which is forced or unnatural and wholly contrary to their original use and purpose.

In the instant case the plaintiff was seeking to present a practical, successful coin ejector which would in addition to other qualities eject coins of underweight. The evidence seems to be clear that no such coin ejector had ever been offered to the public. Naturally, coin ejectors have many ele-

ments that are common. Such old elements can not be used as the sole basis of a valid patent claim. They are available to any inventor. It is the addition of new elements or new location of old elements or both whereby a coin ejector will eject an under-weighted coin, that supplies the sole basis of the plaintiff's claim to a valid patent. Even when we take all of the elements of the three patents in suit and select elements from each and put them together as they never have been put together before, we still do not have the plaintiff's combination as evidenced by claim 21.

Before writing the final word on this issue of invention, two phases of the question, neither controlling, but both persuasive, must be considered:

First, the words and acts of defendant before the District Court passed on the issue of priority. Defendant filed an answer and counterclaim in this suit. The latter, rather slovenly drawn, denies plaintiff's right under the patent because defendant, not plaintiff, was the inventor. By far the greater part of the trial and most of the evidence received bore on defendant's contention that its employee, Patzer, was the first inventor of this machine,—that is he was ahead of Fry. On the trial in the lower court, Patzer was offered as a witness. Defendant's counsel stated that he was being interrogated in reference to the counter claim and stated, "I have a copy of the Patzer-Tratsch patent, 2,326,673, dated August 14, 1943, which is the subject-matter of the counterclaim."

Much evidence other than Patzer was offered to prove priority of invention by Patzer. It was not until the court found against Patzer and in Fry's favor on this issue of priority that the defendant switched its defense from its claim under a valid patent to the invalidity of plaintiff's invention. Had the Patzer claim of priority been sustained, validity would no doubt have been asserted by the defendant. In fact, its invalidity was seriously advanced only when defendant found that Fry was the first inventor of the machine in suit. Even then defendant reluctantly gave up its asserted defense of priority of invention over Fry. In its printed brief in this court it argued at length that Patzer was prior to Fry and its later patent No. 2,371,310 should be recognized. On oral argument in this court defendant for the first time conceded that Fry was first.

■ Of course, defendant's inconsistency does not establish validity of plaintiff's patent or the patentable novelty of the Fry device. This is so because the public has an interest in the outcome of the litigation. The litigants can not make admissions which are binding on the public. Nevertheless, as in a definition of a reasonably prudent investor, or of an ordinary careful man, we think it is enlightening and most significant to ascertain the views of two sharply contesting competitors in this field before their rights were determined, and when both believed they would prevail.

It is of course important that we recognize defendant's right to enlightenment and change of view after study. But the nature of its light, seen only after it found its competitor was ahead of it, carries several adverse deductions, one of which is bad faith and lack of sincerity in its contention of invalidity.

■ The second significant factor is the rule of law applicable to a case where the controversy is narrowed to the issue of patentable novelty and where it is established that utility and novelty exist. Upon such a showing the courts have placed the burden upon the infringer to show the novelty was not patentable. This we think is a logical deduction from the copying by the infringer.[3]

The rule of law follows logically from the language of the statute. The Constitution expressly authorized Congress to enact patent laws. Const. art. 1, § 8, cl. 8. Pursuant to this grant of authority Congress enacted the patent law. It defined who might receive a patent. It was of

[3] Mumm v. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017; The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co.), 143 U.S. 275, 285, 12 S.Ct. 443, 450, 36 L.Ed. 154, 161; Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812.

course referring to a valid patent, not to invalid grants. If one who met the requirements of the statute was to be denied a patent when his product possessed novelty and utility, the burden was on the infringer, to show the novelty was insufficient.

Strictly construed the statute does not permit of the court's weighing the extent or nature of the novelty but a long line of decisions holds that the invalidity may be declared where the novelty represents only the action of a mechanic.

We are convinced that this burden which rests on the defendant has not been overcome. If we were otherwise in doubt we would be compelled to resolve it in plaintiff's favor because of this rule of law in re burden of proof and because of defendant's action in copying plaintiff's machine and asserting it to be the subject of a valid patent to it, until it was defeated on the issue of priority and, as the final reason for sustaining the patent, the extensive acceptance by the public, which met the appearance of this machine.

We quote claim 21

"The combination in a coin selecting apparatus *of the character described for separating undersized coins* from coins having predetermined acceptable diameters of

a frame having a coin receiving pathway,

*a connecting coin rejection pathway,*

a connecting coin acceptance pathway,

a pivotally mounted member *having a pair of integral spaced projections normally extending into said coin receiving pathway,*

*means adapted to yieldably urge said projections into a normal position,*

*said member swingably secured to a movable retainer, said retainer yieldably positioned to the said frame adjacent to said receiving pathway and adapted to be laterally displaced from said frame to withdraw said projections from said receiving pathway,*

said pair of projections spaced in relation to encounter the edge of a coin of acceptable diameter propelled by gravity in said receiving pathway to swing said member to divert said coin into said acceptance pathway,

*said projections · arranged to by-pass there between a coin propelled by gravity in said receiving pathway* having a diameter less than a coin of acceptable diameter, to separate undersized coins from coins having acceptable diameters and *to scavenge said pathways."*

The specifications together with elaborate drawings describe most specifically the structure which the plaintiff put into large commercial use and which the defendant copied.

If the claim 21 in issue is susceptible of successful attack, it must, we think, be attributable to plaintiff's incorporation of its specifications and drawings into the elements of its claims. The extent to which the courts will consider the drawings and specifications to limit or clarify the product described in the claim is always a debatable matter. We think the best rule necessitates the court's looking to said specifications and drawings to ascertain better and more fully the length and breadth of the invention described in the claim.[4] Such light may and probably usually does, limit the scope of the claim. But it adds to the certainty of the correctness of the court's understanding and construction of the invention and the patent. Therefore, the court should seek the light which said specifications and drawings shed on the applicant's invention. In this instance it helps immeasurably to a better understanding of patentee's mechanism.

The italicized words of the claim allegedly distinguish the patent and plaintiff's device from the prior art. While there are coin ejectors in the prior art other than those relied upon by the District Court, we are satisfied that the defendant's chief reliance is to be found in these prior patents cited by the District Court.

We are not impressed by the asserted anticipation by either of the three cited patents, separately considered, or viewed collectively.

The Cahoon patent was on a *vending machine* usable by a purchaser who inserted a coin to buy a stamp. It might well be dismissed from our consideration as not being in the same or analogous art. Passing this

---

4 Chicago Steel Foundry Co. v. Burnside Steel Foundry Co., 7 Cir., 132 F.2d 812.

340

distinction, however, it is clear that its drawings could not be followed and plaintiff's coin ejector built. The witnesses apparently so agreed.

The fact that Trippensee's structure was never used and no machine ever built under the patent, does not eliminate it as an anticipation. Yet it is clear that plaintiff's machine differed from it and was an advance over it. The italicized elements of claim 21 point out the differences.

The Trippensee patent, as well as the Du-Grenier machine, fails to show in its coin receiving passage, means for weighing, measuring, or rejecting coins *that are of proper size but underweight.*

Emphasis must be placed on the plaintiff's problems and its means of solving them. The elimination of underweight coins of admittedly proper diameter was its particular objective. The prior art patents dealt with machines to defeat the use of other kinds of spurious coins. Plaintiff, however, was building an ejector to eliminate *proper size underweight* coins. The prior art machines may have well served their purpose, yet they did not anticipate Fry, who was building a different kind of a machine designed to serve a different kind of purpose, namely, one which would prevent a cheater from cheating the machine with a different kind of coin from that used to cheat the prior art machines. Here lies the distinction upon which plaintiff rests its whole case.

It might not be going far afield to classify the cheaters into two classes—one we might call the prior art cheaters. They were the older artists or artisans who worked these coin machines successfully with spurious coins until new and better machines defeated their efforts. The second class is the modern or higher skilled cheaters who have found a way to beat the old machines through an underweighted coin. Plaintiff's machine was designed to thwart this kind of cheating. It was accomplished by using many of the old elements *and by adding new elements* which in practice successfully blocked the use of an underweight coin of proper size.

The patent may not be an outstanding one; it may be entitled ·to but a narrow construction. It may in fact be easily avoided. We do not say. But it may not be infringed. Patents are not void because they are small or narrow. The public is benefited by both narrow and broad patents, directly and indirectly. They are directly beneficial for they result in better machines. Indirectly they cause competitors to get busy and produce a still better machine. And finally, the larger improvements come as the result of many short step inventions. At least Congress evidently so believes, for it retains a patent system that rewards those who contribute to the public welfare by new and useful products.

We pass over the defense of aggregation partly because it is not seriously advanced by defendant and also because we think it is clearly not sustained. It is clear we think that the elements co-operate and if they spell out patentable invention the defense of aggregation fails. Nordberg Mfg. Co. v. Wollery Machine Co., 7 Cir., 79 F.2d 685.

The decree is reversed with directions to enter a decree for an injunction and accounting.