**ROPAT CORPORATION, Plaintiff,**

v.

**WEST BEND COMPANY, Defendant.**

**No. 74 C 207.**

United States District Court,
N. D. Illinois, E. D.

July 31, 1974.

Company, for summary judgment. For the reasons set forth below, the motion is denied.

This is a patent infringement action brought by the plaintiff, Ropat Corporation, for infringement of U.S. Letters Patent No. 3,611,910 (Hughes or '910) issued on October 12, 1971 to John S. Hughes. The Hughes patent discloses what has become a familiar sight in the homes of our nation, a corn popper with a transparent cover which acts as a serving bowl when the popper is inverted and the base is removed. The defendant asserts that claims 2, 7, 8 and 9 of the '910 patent are invalid under 35 U.S.C. § 102(b). That section provides:

"A person shall be entitled to a patent unless

\* \* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States , . . . ."

The defendant asserts that U.S. Patent No. 1,380,579 (Neff or '579), issued on June 7, 1921 to Abner Neff, clearly anticipates the Hughes patent, rendering it invalid. For purposes of this motion only, defendant concedes that plaintiff is the owner of the patent.

Richard R. Trexler, Olson, Trexler, Wolters, Bushnell & Fosse, Ltd., Chicago, Ill., for plaintiff.

William Marshall Lee and Thomas E. Smith, Lee & Smith, Chicago, Ill., and Paul R. Wylie, Jr., Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This matter is before the Court on the motion of the defendant, West Bend

### I.

The abstract of the Hughes patent describes the invention and its purpose as follows:

"Corn is popped in a shallow base covered by a substantially larger dome so that the popped corn rises into the dome, and the dome is constructed so that the dome and the base can be inverted to rest the popper on the dome for separating the base from the dome and serving the popped corn in the dome. The dome is preferably transparent and removably interlocked with

the base which preferably contains an electric heater." The device has the following appearance:

PATENTED OCT 1 2 1971

3,611,910

FIG.1

FIG.2

FIG.3

FIG.4

FIG.5

INVENTOR.
JOHN S. HUGHES

BY

ATTORNEYS

Claim 2 describes a corn popper comprising:

"a. a base;

"b. means for supporting said base in popping position on a flat surface;

"c. a pan arranged in said base for containing unpopped kernels of popcorn, when said base is in said popping position;

"d. heating means arranged in said base for heating said pan to pop said kernels;

"e. a single piece dome separably supported on said base over said pan when said base is in said popping position;

"f. the inside volume of said pan being substantially less than the volume of a full charge of popped corn for said popper;

"g. the inside volume of said dome being several times the inside volume of said pan so that said popped corn rises into said dome; and

"h. the uppermost surface of said dome in said popping position being formed with at least three substantially spaced points lying approximately in a plane parallel with said flat surface so that said dome stably supports itself and said base on a flat surface in a position inverted from said popping position for removal of said base from said dome and serving of said popped corn in said dome."

Claim 7, which is dependent upon Claim 2, describes the uppermost surface of the dome as being flat. Claim 8, which is also dependent upon Claim 2, describes handles arranged for inverting the dome and base together. Claim 9 describes the following:

"A corn popper comprising a shallow cooking vessel for receiving popping corn and cooking oil in which said corn is popped, electric heating means mounted in heat exchange relation with the exterior of said vessel, housing and stand means for supporting said vessel in an upright position, said housing insulating said heating means from a surface on which said popper is supported, an enlarged cover for said vessel having a mouth defined by the downwardly extending walls thereof, said cover being supported with said mouth superimposed over said vessel, said cover having a volume substantially greater than the volume of said vessel, and handle means for retaining said vessel and cover in assembled relation and for inverting said vessel and cover as a unit, said cover having a stand permitting it to rest in an inverted position whereby the cover serves as a container and the vessel serves as a cover."

Thus, the key features of the patent are an enlarged dome covering a shallow popping pan (this allows the popcorn to rise into the dome); an ability to observe the corn popping through utilization of a transparent dome (this allows the cook to know when the process is completed); the dome and pan can be inverted together and stand (this prevents the corn from burning); and the dome can be used as a serving bowl.

The Neff patent also discloses a corn popper. It consists of a shallow base pan which is covered by a removable dome-shaped cage made of fine wire netting. The pan is heated by an electrical heating grid placed below it. The purpose of the cage is to completely enclose the popper and it can be removed either to allow removal of the popcorn or to use the base pan for other operations.[1]

II.

■ The Court is first faced with a preliminary question as to whether the presumption of validity should apply to the Hughes patent. As a general principle, an issued patent is presumed valid. 35 U.S.C. § 282; Copease Mfg. Co. v. American Photocopy Equipment Co., 298

---

1. See Appendix 1 for complete text of the Neff patent.

F.2d 772 (7th Cir. 1961). However, where a pertinent prior art patent exists and was not brought to the attention of the Patent Office, the presumption of validity does not exist. See, *e.g.*, Fredman v. Harris-Hub Co., 442 F.2d 210, 214 n. 10 (7th Cir. 1971). Even one prior art reference not before the Patent Office can overcome the presumption. See T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966).

██ Two inquiries must be made. First, the question exists as to whether or not the anticipating patent is pertinent. The defendant, for purposes of this motion, assumes that no other single prior art reference includes all of the elements of claims 2, 7, 8 and 9 of the Hughes patent. The Court believes that Neff is pertinent because it sets forth an electric corn popper which has a removable cage with an observability feature.[2] A patent is pertinent where the key features are similar. See Appleton Elec. Co. v. Efengee Elec. Supply Co., 412 F.2d 579, 581 n.4 (7th Cir. 1969). As Neff has many key features present in Hughes, it is pertinent.

The second inquiry is whether or not Neff was considered by the Patent Office. It is not in dispute that Neff was not originally referred to in the patent application, nor is Neff a cited reference by the Patent Office. Neff was listed in a preliminary amendment filed on January 17, 1966 as a patent which "[was] selected as most representative of the state of the cornpopper art." Neff is not cited by name, only by number, and is in the middle of a list of 23 patents. The file wrapper history shows a check mark ("✓") next to the Neff reference.

Several courts have held that limited disclosure is not to be equated with consideration by the Patent Office. In Kaiser Inds. Corp. v. McLouth Steel Corp., 400 F.2d 36 (6th Cir. 1968), where the sole disclosure of a prior patent had been in affidavits filed two weeks prior to issuance, the court stated: "Such an off-hand reference does not amount to Patent Office consideration of the prior art patent." *Id.* at 43 n. 6. See also T. P. Labs, Inc. v. Huge, 371 F.2d 231 (7th Cir. 1966) (patent was listed in one application but not in another). One court, however, has held that patents cited in a "Petition to Make Special" could be assumed to have been considered by the Patent Examiner. See Edoco Technical Products, Inc. v. Peter Kiewit Sons' Co., 313 F.Supp. 1081 (C.D.Cal. 1970).[3]

2. The prior art references when considering anticipation do not appear to be more pertinent than Neff. The Kimmel patent, No. 1,974,360, discloses a portable electric heating utensil which might be used for popcorn. The Barnard patent, No. 1,642,531, discloses a utensil for popping corn which is primarily a kettle over a heating element and which has a stirring means. The Richheimer patent, No. 2,105,201, discloses a locking cover for pots. The Serenberg patent, No. 1,992,843 discloses an electrical cooking utensil which is a pot heated through an electrical heating base. The Bruening patent, No. 2,364,125, discloses a container made up to two connected bowls. The Beckenmeyer patent, No. 2,522,085, discloses a cornpopper, made up of a serving pan and handle which fits into the heating base. The Curry patent, No. 2,650,736, discloses a complete cornpopper and server made in the form of truncated cones. This system does not have its own source of heat. The Meier patent, No. 2,659,222, discloses a compotier, or covered dish. The Howe patent, No. 2,661,862, discloses a closure assembly for containers. The Burreson patent, No. 2,901,587, discloses an electric cornpopper with a container and thermostatic temperature control. The Kueser patent, No. 2,923,803, discloses an automatic electric cornpopper with temperature control.

3. A "Petition to Make Special" is, however, a fairly unique procedure because the Patent Office agrees to expedite the examination of the patent. See Rules of Practice in Patent Cases, § 708.02 (1970), reprinted in 6 Dellers', Walker on Patents, Appendix to Chapter XVI, at 365 (2d ed. 1972). Also, the applicant must affirm that a search was made, and provide copies of cited references and a detailed discussion of the references. See *id.* at 366 (§ 708.02—Special Examining Procedure for Certain New Applications—Accelerated Examination (c)(d) and (e)).

In Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc., 362 F.Supp. 130 (E.D.Va.1973),[4] the court was faced with a situation in which the plaintiff had filed a list of references in a preliminary amendment and a pertinent prior art patent was not cited by the Examiner. The court determined that the question of the presumption to be given plaintiff depended upon the pertinency of the patent. *Id.* at 142. In that case the parties agreed that the non-cited patent was more pertinent and the court held that the presumption was weakened and it would examine the patent's validity independently.

■ In the instant case, the Court believes that the presumption of validity has been weakened by the Patent Office's failure to cite Neff, and as Neff is highly pertinent, the presumption will not be given its usual weight.[5]

### III.

The next issue is the appropriateness of summary judgment. F.R.Civ.P. 56 provides, *inter alia*, that summary judgment should not be granted if genuine issues of material fact exist. Judge Frank, in discussing the role of summary judgment in patent cases, stated:

"Summary judgment represents a most useful legal invention to save time and expense, by the avoidance of a trial when there exist no material fact-issues. It may well be that, in a patent case, a judge should exercise unusual caution in granting a summa-

ry judgment. But there are patent cases where it would be an absurd waste of time and effort to deny such a judgment. This is such a case.

"In many a patent suit, there arise issues of fact as to which the testimony of expert witnesses may be important. Then the credibility of those witnesses is crucial, and it would be erroneous, by a summary judgment, to deprive either party of a 'live trial' at which the trial court could observe the witnesses' demeanor in evaluating their testimony. There was no such issue here. The prior art and the patent claims are, without expert aid, easily understandable by anyone of the most modest intelligence. * * *"

Vermont Structural Slate Co., Inc. v. Tatko Brothers Co., Inc., 233 F.2d 9, 10 (2d Cir.) (footnotes omitted), cert. denied, 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed. 2d 123 (1956). See also Appleton Electric Co. v. Efengee Electrical Supply Co., 300 F.Supp. 296 (N.D.Ill.1968), aff'd, 412 F.2d 579 (7th Cir. 1969); C-Thru Products, Inc. v. Uniflex, Inc., 397 F.2d 952 (2d Cir. 1968); Monaplastics, Inc. v. Caldor, Inc., 378 F.2d 20 (2d Cir. 1967); American Tube & Controls, Inc. v. General Fittings Co., 407 F.2d 1291 (1st Cir. 1969).[6] The important inquiries are related to the claims of the patent; to what extent they are reflected in Neff, and the standards by which the patent must be judged. It is therefore necessary at this point to discuss the

---

4. Defendant has informed the Court that this case was affirmed by the Fourth Circuit Court of Appeals on March 25, 1974. See Lundy Electronics & Systems, Inc. v. Optical Recognition Systems, Inc., 493 F.2d 1222 (4th Cir. 1974).

5. It may seem circuitous to state that if the patent is pertinent the presumption will be reduced because the determination of pertinency depends to some extent upon a determination of the merits. However, the determination of pertinency does not depend solely on the anticipatory nature of the patent, nor are the same tests necessarily relied

upon, nor are the same weights applied in the determination.

6. It is interesting to note that in most of the above cited cases, the patent was being attacked as invalid under 35 U.S.C. § 103, or as being "obvious." The test of obviousness encompasses a broader range of questions than anticipation under § 102. See, generally, Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). However, this does not mean that this case should be determined on anything other than its own facts.

standards the Court should apply in determining if there has been anticipation.

## IV.

Anticipation is a fairly technical and strict defense. See Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F. 2d 1180, 1182–1183 (7th Cir. 1971). As a rule, anticipation and § 102(b) require that "all of the elements of a patented device or their equivalents must be found in a single prior device. . . . [I]t is sufficient if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art." Amphenol Corp. v. General Time Corp., 397 F.2d 431, 438 (7th Cir. 1968) (citations omitted).

 This means that, except for insubstantial differences, the prior patent contains all of the same elements operating in the same fashion to perform an identical function. See Popeil Bros., Inc. v. Schick Electric, Inc., 494 F.2d 162 (7th Cir. 1974); see also, Shelco, Inc. v. Dow Chemical Co., 466 F.2d 613 (7th Cir. 1972); Delta Mfg. Co. v. E. L. Essley Machinery Co., 153 F.2d 905 (7th Cir. 1946). It is also clear that one may not adopt an old device and merely identify a function it was capable of performing. See, e. g., General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 247–249, 66 S.Ct. 81, 90 L.Ed. 43 (1945); Amphenol Corp. v. General

Time Corp., 275 F.Supp. 903, 907 (N.D. Ill.1967). The important factor is the novelty of the invention.[7] Furthermore, in analyzing the specifications and drawings, it is necessary that the Court not give them an application or construction which is unnatural, forced, or contrary to their original use and purpose. See, e. g., National Slug Rejectors v. A. B. T. Mfg. Corp., 164 F.2d 333, 337 (7th Cir. 1947). It becomes necessary at this point to evaluate the two patents and compare their disclosures.

As to Claim 2, defendant contends that each element in Hughes is present in Neff. Both have a base. Hughes next requires a "means to support [the] base in popping position on a flat surface." In Figures 6–8 of Neff, the handle to hold the pan extends downward. This is evident from both the cross-section view and the aerial view (Figure 7—from which the handle cannot be seen). Plaintiff contends that this difference defeats anticipation. However, in figures 1–3, the handle extends outward, not downward, and a flat base is present. In his disclosure Neff indicates that the handles can be substituted and nothing in the patent indicates that the handle position is vital to either of the embodiments (figures 1 or 6). While Hughes' drawings indicate a tripod leg system as the means, the claim does not require it and Neff's flat base can serve as a means of support.

7. In General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945), the Court found that a patent for an electric light bulb, frosted on the interior with rounded crevices had been anticipated by one with angular crevices or pits. In Popeil Bros., Inc. v. Schick Electric, Inc., 494 F.2d 162 (7th Cir. 1974), the court held that hair curlers heated by steam had been anticipated by hair curlers heated by boiling water. In Shelco, Inc. v. Dow Chemical Co., 466 F.2d 613 (7th Cir. 1972), the court held that minor differences in the amounts of certain types of chemicals used in oven cleaners were not sufficiently important to avoid anticipation. In Illinois Tool Works, Inc. v. Sweetheart Plastics,

Inc., 436 F.2d 1180 (7th Cir. 1971), the court held that nestable, thinwall plastic containers, primarily used in automatic dispensing machines, were not anticipated by other types of paper cups. In Delta Mfg. Co. v. E. L. Essley Machinery Co., 135 F.2d 905 (7th Cir. 1946), the court held that a safety shield for grinding machines was not anticipated by either a cover for a cutting machine or device for illuminating a magnifying glass. In National Slug Rejectors v. A. B. T. Mfg. Corp., 164 F.2d 333 (7th Cir. 1947), the court found that a device which ejected proper size underweight coins was not anticipated by a device which ejected improper size coins.

The plaintiff also contends that Neff does not provide that the inside volume of the pan is substantially less than the volume of a full charge of popped corn. A view of the Neff patent shows that the cage is substantially larger than the pan. It appears that the one purpose of having a wire cage is to observe the corn popping. If it were expected that the pop corn would not overflow the pan, a wire plate-like structure could be used. The dome is larger and it is clear that one purpose is to retain the pop corn, which would indicate that the pop corn would overflow the pan. The pan is also described as being a shallow tray (page 1, line 70). Plaintiff contends that Neff does not disclose that the volume of the dome is such that the popped corn arises within the pan. It contends that the Neff cage merely keeps the kernels from flying around. However, if enough corn is put into the Neff base, the cage can be filled with pop corn as the process goes on. Thus, this aspect of the dome's function is present in Neff.

■ Plaintiff also contends that the foraminous cage disclosed in Neff does not meet the requirements of claim 2(h), which requires that the uppermost surface of the dome is formed by at least three points (which constitute a plane) which lie parallel to the flat surface of the base, so that the dome supports itself and the base on a flat surface in a position inverted from the popping position. This allows for the removal of the base from the dome and the serving of the corn in the dome. Plaintiff first contends that the cage is not able to act as a server because uncooked kernals, salt and butter would seep through the foraminous cage. Defendant responds to this with the contention that the claim, by which plaintiff is bound, only provides for the serving of popped corn and does not mention butter or salt. This does not give to plaintiff a reasonable reading of the serving function. The Court believes, however, that a fine wire netting could be (and has been) used as a serving utensil, albeit somewhat messy, so anticipation is present on this point.

■ However, the claim also requires that the dome be constructed so that it can support itself and the base on a flat surface in the inverted position. This is a function of the dome; however, it also has implications as to the dome's construction and structure. Nothing in Neff provides for the cage to be of such construction so that it can support itself and the base in an inverted position and allow for serving. Both embodiments of Neff negate this ability, since figure 1 has the handle at the side which would create an imbalance and in figure 6 the handle on the bottom would not allow the device to stand in an inverted position. Further, the construction of the cage is made up of a fine wire net over a wire frame, which might not have the requisite strength. Nowhere in Neff is this ability of the structure disclosed. While the Neff cage might be usable for serving, or is removable, or has an observability feature, its structure is not the same nor does it serve the same purposes as Hughes. The structure does not allow the combination of operations to be done by it that the Hughes claims require. See, e. g., National Slug Rejectors v. A. B. T. Mfg. Corp., *supra*; Delta Mfg. Co. v. E. L. Essley Mach. Co., *supra*. Since this ability to stand in an inverted position is important, anticipation of claim 2 is not present.

Since claims 7 and 8 are dependent on claim 2, anticipation is not present there. Since claim 9 requires the dome to have a structure which can do the functions claim 2 requires, anticipation is not present as to it for the same reasons as stated above. The question of obviousness, of course, remains open. But for the reasons stated, the motion for summary judgment must be denied.

It is so ordered.

Appendix to follow

A. R. NEFF.
ELECTRIC POPCORN POPPER.
APPLICATION FILED MAY 31, 1919.

**1,380,579.**

Patented June 7, 1921.
2 SHEETS—SHEET 1.

Fig. 1.

Fig. 2.

Fig. 3.

Fig. 4.

Fig. 5.

Inventor
Abner R. Neff
by
James T. Bardslew
his Attorney.

A. R. NEFF,
ELECTRIC POPCORN POPPER.
APPLICATION FILED MAY 31, 1919.

1,380,579.

Patented June 7, 1921.
2 SHEETS—SHEET 2.

Fig. 6.

Fig. 7.

Fig. 8.

Inventor
Abner R. Neff
by
James T. Barkelw
his Attorney.

# UNITED STATES PATENT OFFICE.

## ABNER R. NEFF, OF LONG BEACH, CALIFORNIA.

### ELECTRIC POPCORN-POPPER.

**1,380,579.** Specification of Letters Patent. **Patented June 7, 1921.**

Application filed May 31, 1919. Serial No. 300,831.

*To all whom it may concern:*

Be it known that I, ABNER R. NEFF, a citizen of the United States, residing at Long Beach, in the county of Los Angeles, State of California, have invented new and useful Improvements in Electric Popcorn-Poppers, of which the following is a specification.

This invention relates to electrically heated utensils; and an object of the invention is the provision of an electrically heated pop-corn popper; and the provision, in such a pop-corn popper, of a simple and efficient construction which may be easily and effectively used for the popping of pop-corn.

I am not aware that any electrically heated pop-corn popper has been heretofore produced. Whereas a great variety of utensils are now heated by electricity, pop-corn poppers are universally of the old style which are used over a stove or over a slow fire. There are a great many objectionable features to such pop-corn poppers; they necessitate the popping of corn either over a grease producing gas or oil stove or over a hot bed of coals. Neither of these operations is pleasant during the warmer months of the year; and, in general, a great deal of the pleasure of popping corn is taken away by the shortcomings of the old style pop-corn popper. It is an object of my invention to obviate these difficulties and to produce a device which has in it none of these difficulties inherent in the old style pop-corn popper. It is an object of my invention to provide a pop-corn popper which is clean and attractive; and in which only that amount of heat is generated which is necessary to the actual popping of the corn. It is also an object of my invention to provide a construction simple and efficient in itself and, preferably, capable of being used in a variety of manners. Such objects, and further objects and corresponding features of the invention will be best understood from the following detailed description of different forms of pop-corn poppers embodying my invention, reference for this purpose being had to the accompanying drawings in which—

Figure 1 is a sectional plan view of the popper taken on line 1—1 of Fig. 2; Fig. 2 is a side elevation of the popper; Fig. 3 is a sectional view taken as indicated by line 3—3 on Fig. 1; Figs. 4 and 5 are enlarged detail sections of modified forms of the popper; Fig. 6 is a sectional view of a popper embodying the invention; Fig. 7 is a plan of the form shown in Fig. 6, the upper cover being removed; and Fig. 8 is an enlarged detailed section taken as indicated by line 8—8 on Fig. 7.

In the drawings numeral 10 designates the base or pan of the popper on which is mounted the box shaped cage 11. Attached to base pan 10 there is a handle 12. The handle is preferably made of metal soldered or brazed to the base, but however, any suitable material may be used for the handle such as a composition, wood or some similar material.

The base pan 10 is substantially a shallow tray and is preferably formed from one piece of sheet metal and comprises a bottom 13 and sides 14. The sides 14 are not at right angles with the base 10 but flare slightly outward as shown in the drawings.

In the base 10 there is a heating grid 16. The grid 16 is made of a metal or alloy that has sufficient resistance to become heated when an electric current is passed through it. The grid may be any suitable shape and the metal out of which it is made may be either in the form of a wire, a ribbon or a sheet or plate. In Fig. 1 is shown a grid that has been stamped out of a sheet of metal. As shown in the drawings the grid is connected to lead wires 19 which enter the popper through the handle 12 and pass through the handle to the base 10. The wires pass into the base 10 through a hole 35 in the side 14 and connect to the grid as shown in Fig. 1. The grid 16 is preferably made small enough to fit within the base 10 so as to be far enough away from sides 14 to prevent them from becoming heated.

Between the grid 16 and the bottom 13 of base 10 there is a layer of heat insulating material 15. In the preferred form of the invention asbestos is used for this insulation as it not only insulates the grid so that it will not conduct electricity to the bottom 13 but also prevents the bottom from becoming heated when the popper is in operation. With the bottom thus insulated from the grid the popper can be set upon a table or the like without danger to it. Directly on top of the grid there is a thin layer of insulating material 17 which insulates the grid from the cover plate 18 on which the corn is placed. The insulation 17 may be a thin sheet of mica. The protective cover 18 fits

into the base 10 so as to entirely cover and protect the insulation and heating grid. The cover 18 may be made of sheet metal or of wire netting as shown in Fig. 4. The grid, the insulating layers and the cover 18 may form a unit which may be inserted in or removed from the pan, as a whole.

As shown in the drawings, the sides 14 are high enough to extend above the cover 18. In the corners formed by the cover plate 18 and the sides 14 there are curved sheet metal corner pieces 25. The corner pieces may be attached to the sides by means of screws 26. When the corner pieces 25 are in place they hold the insulations and the grid tightly together and press them against the bottom 13 thereby preventing them from becoming shifted or out of place. The corner pieces also act as a fillet to keep the corn away from the sides of the popper and direct it toward the center where it will be over the heating grid.

The cage 11 comprises sides 20, ends 21 and 22 and a top 28. The cage is a perforated structure and is preferably made of wire netting, as shown in the drawings. The cage 11 is substantially the same in construction and it is the same in purpose as the cage structure used in ordinary corn poppers. The perforated construction allows the operator to see the corn pop and enables him to know when it is done and also prevents the corn from being scattered when it is popped. The sides 20 and the ends 21 and 22 are made of wire netting mounted on a wire frame 23. The bottom part of the frame 23 is made to fit into the base 10 so that it rests on cover 18 and the corner pieces 25 fit over the frame 23 and so as to cover it and hold it tightly against the cover 18. The sides and ends of the cage are firmly clamped between the sides 14 and the corner pieces 25.

In Fig. 5 is shown a form of construction in which no corner pieces are used. In this construction there are indentations or grooves in the sides 14 into which the lower part of frame 23 fits.

The cover 28 comprises a wire frame 32 on which is mounted a wire netting or screen 33. The cover is hinged at 27 to end 21. Attached at 29 to end 22 there is a hook 30 which hooks over frame 32 of cover 28 and keeps it closed. The hook 30 is provided with a handle 31 which makes it easy to operate.

The forms of the invention hereinabove described are merely typical and the invention is not limited to such forms as it may be embodied in various forms of popper. For instance, it may take the form shown in Figs. 6, 7 and 8.

In Figs. 6, 7 and 8 is shown a form of construction in which the heating grid, the insulations and the cover are a separate unit and the cage is constructed so that it can be easily removed from the base pan.

As shown in Fig. 6, the asbestos 15ᵃ, the grid 16ᵃ, and the mica 17ᵃ are held together by the cover 18ᵃ. The cover 18ᵃ extends around the edges of the asbestos and mica and is attached to a rectangular wire frame 40 which is a little smaller than the asbestos 15ᵃ. The heating grid, the insulations and the cover being thus held together form a unit that can be easily set in or removed from the base.

The asbestos 15ᵃ is held away from bottom 13ᵃ by the frame 40 thus leaving a space 41 between them. In the bottom 13ᵃ there are perforations or holes 42 which allow air to circulate between the bottom and the asbestos. This construction prevents the bottom from becoming heated even if the asbestos becomes heated. In this form of the invention the handle 12ᵃ may be attached to the bottom 13ᵃ instead of a side 14ᵃ. The heating unit comprising the grid, the insulations and the cover is held in the base by a frame 44 formed of corner pieces or fillets 25ᵃ. The frame 44 fits in the base pan 10ᵃ and is held by fitting under the corrugations 45 near the top of the sides 14ᵃ.

The cage 11ᵃ is made of fine wire netting mounted on a wire frame 46. The frame 46 is made to fit in the outside of corrugations 45. In order to place corn in or remove it from the popper the cage is completely disengaged from the base pan. This makes it possible to use the base for other purposes without the cage. The sides 14ᵃ are not continuous at their corner intersections, but are slit there, as indicated at 14ᵇ. This construction allows the sides to have enough spring to allow the frame 44 and the cage 11ᵃ to be attached to and removed from the base with ease.

The entire device may be finished in any desired manner, for instance, it may be nickel or silver plated or it may be enameled.

When corn is placed in the popper it comes directly in contact with the cover 18. When current is passed through the grid the heat from said grid passes through the thin mica sheet and heats the cover 18. The corn being in contact with the cover 28 becomes heated and pops in the usual manner. As stated above, the corn is prevented from flying out of the popper by the cage structure. In order to prevent the corn from burning the operator may conveniently hold the device by the handle and keep the corn agitated in the usual manner.

From the foregoing description it will be seen that throughout the various forms of my invention there are certain characteristic features. Generally speaking, electrically my heated pop-corn popper embodies a holder for the pop-corn, which holder may be in the form of a pan alone or in the

form of an all inclosing cage. In a preferred form, the upper cage proper may be removable from the pan, so that the pan may be used either as a popper or for other purposes. Also, in a preferred construction, the heating unit is removable from the pan. I thus provide one unit consisting of the pan, with its handle, the pan having perforations for the passage of electric feed wires. This pan may also be perforated on the bottom to provide for air circulation. Then I provide another unit comprising the electric heating element with its protective and insulating parts; and a means for holding the heating unit in the pan. This holding means may be provided preferably in the form of a fillet, which, as hereinbefore described, directs the corn away from walls of the pan and back to the effective part of the heating element itself; so that the heating element need not extend close to the walls of the pan and so that the pop-corn is kept at all times over the hot part of the heating element. This arrangement keeps the heat well within the structure, and keeps it from radiating out into the surrounding air. My construction concentrates the heat upon the pop-corn rather than wasting it by radiation to the surrounding air. Then the third unit of a preferred form of my device comprises the upper cage which is removably mounted upon the pan. When this upper cage is used the pop-corn is completely inclosed. The upper cage may be removed, either for the purpose of removing the pop-corn from the popper or it may be removed for the purpose of using the pan for other operations.

The foregoing description will now suffice to set forth my real invention; which is not limited to the specific and particular details which I have here described. I have entered into these particular details for the purpose of making my invention fully intelligible in a practical and operative form; and not for the purpose of limiting my invention to these particular details.

Having described a preferred form of my invention, I claim:

1. An electrically heated pop-corn popper embodying a pan, a heating element therein, a foraminous cage over the top of the pan; the heating element being spaced at its edges from the walls of the pan, and a sloping fillet member around the walls of the pan with its slope leading to a point over the heating element to direct pop-corn away from the walls and over the heating element.

2. In an electrically heated utensil, a container, a heating element therein with its edges spaced from the sides of the container, and a fillet member in the container with its slope leading to a point over the heating element to direct matter in the container away from its walls and over the heating element.

3. In an electrically heated utensil, a container, a removable heating element therein with its edges spaced from the sides of the container, and a sloping fillet member in the container with its slope leading to a point over the heating element to direct matter in the container away from its walls and over the heating element; said fillet member extending over the edge of the heating element to hold it in place and being removably held in the container.

4. In an electrically heated utensil, a container, and a heating unit therein embodying a heating element having a heat insulating layer on its underside, said container being adapted to receive material upon said heating unit, the unit being spaced above the bottom of the container, and the container bottom being perforated to allow air circulation below the heating unit.

5. In an electrically heated utensil, a pan, a heating unit removably placed in the bottom of the pan and embodying a heating element with a heat insulating layer below it, the heating unit being spaced slightly above the pan bottom and the bottom being perforated; the heating element being spaced at its edges all around from the sides of the pan; and a fillet member around the sides of the pan with its lower edge resting on the heating unit to hold it in place.

6. In an electrically heated utensil, a pan, a heating unit removably placed in the bottom of the pan and embodying a heating element with a heat insulating layer below it, the heating unit being spaced slightly above the pan bottom and the bottom being perforated; the heating element being spaced at its edges all around from the sides of the pan; and a fillet member around the sides of the pan with its lower edge resting on the heating unit to hold it in place; the sides of the pan being resilient and having a shoulder which is sprung over the fillet to hold it in place.

7. In an electrically heated utensil, a pan, a heating unit removably placed in the bottom of the pan and embodying a heating element with a heat insulating layer below it, the heating unit being spaced slightly above the pan bottom and the bottom being perforated; the heating element being spaced at its edges all around from the sides of the pan; and a fillet member around the sides of the pan with its lower edge resting on the heating unit to hold it in place; the sides of the pan being resilient and having a shoulder which is sprung over the fillet to hold it in place; and a cage removably mounted over the top of the pan.

8. An electric heating unit embodying a heating element, a heat insulating layer on one side of the element, and an insulating layer and a protective metal covering on the other side of the element, the metal cov-

ering being bent around the edges of the element and heat insulating layer to bind the whole unit together.

9. An electric heating unit embodying a heating element, a heat insulating layer on one side of the element, an insulating layer and a protective metal covering on the other side of the element, the metal covering being bent around the edges of the element and heat insulating layer to bind the whole unit together; and a wire frame around which the edge of the metal covering is bent to form a bead for spacing the heat insulating layer from a surface on which it rests.

10. A corn popper comprising a pan, a handle on said pan, a heating element in said pan, said element being adapted to become heated when an electric current is passed therethrough, and a foraminous cage over the top of the pan.

11. In an electrically heated utensil, a pan, a heating unit removably placed in the lower part of the pan, a fillet member within and around the pan with its lower edge rest-ing on the heating unit to hold it in place, and the pan walls releasably engaging the outer edge of the fillet member so that the fillet and heating unit may be removed.

12. In an electrically heated utensil, a pan, a heating unit removably placed in the lower part of the pan, a fillet member within and around the pan with its lower edge resting on the heating unit to hold it in place; the sides of the pan being resilient and having a shoulder which is sprung over the fillet to hold it in place.

13. A corn popper comprising a pan, a handle on said pan, a heating element in said pan, said element being adapted to become heated when an electric current is passed therethrough, and a removable foraminous cage over the top of the pan.

In witness that I claim the foregoing I have hereunto subscribed my name this 21st day of May, 1919.

ABNER R. NEFF.

Witness:
 VIRGINIA BERINGER.